IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 13-cv-00789-PAB-KLM

WARDCRAFT HOMES, INC., a Kansas corporation,

      Plaintiff,

v.

EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation,

      Defendant.

---

## ORDER

---

This matter is before the Court on the Motion for Partial Summary Judgment [Docket No. 17] filed by plaintiff Wardcraft Homes, Inc. ("Wardcraft") and the Motion for Summary Judgment [Docket No. 24] filed by defendant Employers Mutual Casualty Company ("EMC"). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND[1]

Wardcraft manufactures pre-fabricated homes at a facility in Fort Morgan, Colorado. Docket No. 17 at 3, ¶ 1. In 2007, Distinguished Builders, Inc. ("DBI") was an independent contractor of Wardcraft who purchased Wardcraft-manufactured homes and then resold and constructed those homes in, as relevant here, the Oak Creek, Colorado area. *Id.* at 3, ¶ 2. Wardcraft was insured under a Commercial General Liability insurance policy, policy number 2D9079709 (the "policy"), issued by EMC. *Id.*

---

[1]The following facts are undisputed unless otherwise indicated.

at 4, ¶ 9; *see also* Docket Nos. 17-3 through 17-6.[2]  The policy provided coverage from November 24, 2008 through November 24, 2009.  *Id.*

In March 2007, William and Grace Stuhr contacted Wardcraft about purchasing a modular home to be constructed in Oak Creek, Colorado.  Docket No. 20-1 at 2, ¶ 8.  The Stuhrs were then contacted by DBI and, on June 19, 2007, entered into a purchase agreement (the "purchase agreement") with DBI for the purchase and construction of a Wardcraft-manufactured home.  *Id.* at 2, ¶¶ 8, 10.  The home was not completed as scheduled and, according to the Stuhrs, at the time they filed the complaint was "unfinished with numerous defects."  *Id.* at 3, ¶ 18.  As a result, on October 30, 2009, the Stuhrs filed suit against Wardcraft and DBI in the District Court for Routt County, Colorado, Case No. 09CV293 (the "Stuhr suit").  *Id.* at 1; Docket No. 24 at 2, ¶ 1.  The Stuhrs' Verified Complaint (the "Stuhr Complaint")[3] asserted claims against Wardcraft for negligence, breach of warranty, and deceptive trade practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-105(g).  Docket No. 20-1 at 5, 6, 8.

In December 2009, the Stuhr Complaint was tendered to EMC.  Docket No. 24 at 2, ¶ 2.  In a letter received by Wardcraft on February 5, 2010 (the "letter"), EMC informed Wardcraft that it was denying coverage under the policy and any duty to defend, stating, in part:

---

[2]The policy appears to be a "post-1986 standard-form" Commercial General Liability ("CGL") policy in all material respects.  *See Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1277 (10th Cir. 2011).

[3]All references to the "Stuhr Complaint" in the underlying suit are to the original complaint, filed October 30, 2009, unless otherwise indicated.

> In connection with the CGL policy, the alleged construction defects are not property damages and there is no occurrence in connection with faulty workmanship.  In addition, the loss of use coverage is barred by Exclusion 2.l. and loss of use damages associated with construction defects or delays are barred by Exclusion 2.m.  Because there is no duty to indemnify, a defense will not be provided.   There is also no coverage under the Commercial Umbrella Policy.

Docket No. 17-7 at 5.  On March 9, 2012, the Stuhrs filed the Second Verified Amended Complaint ("Second Amended Complaint"), which added a negligence claim against James Pool, Terry's Crane and Rigging, Inc., and Preferred Transportation, Inc. Docket No. 24 at 2, ¶ 3; Docket No. 17-2.  Daniel Pence, an EMC adjustor assigned to Wardcraft's claim, states that Wardcraft did not tender the Second Amended Complaint to EMC and that Wardcraft first notified EMC of the Second Amended Complaint in a March 14, 2013 letter from Wardcraft's counsel.  Docket No. 24-3 at 1, ¶¶ 6-7. Wardcraft responds that "EMC was put on notice of the proceedings," but does not otherwise identify or produce any evidence that the Second Amended Complaint was, at any point, tendered to EMC.  Docket No. 32 at 1, ¶ 4.  The record contains no evidence that, prior to initiating the present suit, Wardcraft provided EMC with additional information or requested that EMC reconsider its decision to deny coverage.  Wardcraft provides no evidence and makes no allegation that, after informing Wardcraft of the decision to deny coverage, EMC took any wrongful action or inaction with respect to Wardcraft's claim.

Wardcraft claims to have defended the Stuhr suit.  Docket No. 17 at 4, ¶ 8.  In early February 2013, the Stuhrs, Wardcraft, and DBI fully executed a settlement agreement (the "settlement agreement"), retroactively effective as of January 14, 2013, under which Wardcraft paid the Stuhrs $50,000 to settle the claims brought against it in

3

the Stuhr suit.  Docket No. 32-1 at 1, 4.[4]

On February 4, 2013, Wardcraft filed the present case in the District Court for Routt County, Colorado.  Docket No. 1 at 1.  On March 27, 2013, EMC timely filed a Notice of Removal.  *Id.*  Wardcraft's complaint alleges that it tendered defense of the Stuhr suit to EMC, but that, on February 5, 2010, EMC denied coverage under the policy and declined to defend Wardcraft in the Stuhr suit.  Docket No. 3 at 3, ¶¶ 17, 21.  Wardcraft claims that it was entitled under the policy to have EMC defend it in the Stuhr suit and indemnify it for the amount paid to the Stuhrs pursuant to the settlement agreement.  *Id.* at 3, ¶ 25.  Wardcraft brings claims against EMC for breach of contract for EMC's failure "to undertake the defense of Plaintiff in the Stuhr suit" and failure to indemnify, *id.* at 3, ¶¶ 28, 29, bad faith breach of insurance contract for "unreasonably refusing to provide a defense," *id.* at 4, ¶ 33, and unreasonable conduct in violation of Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116 for "failure to provide a defense," *id.* at 4, ¶¶ 37, 39.  Wardcraft also seeks a declaratory judgment that Wardcraft was covered under the policy and that EMC "has not complied with its duties and responsibilities to defend or indemnify Plaintiff in the Stuhr suit."  *Id.* at 5, ¶ 46.

On November 1, 2013, Wardcraft filed its motion for partial summary judgment.  Docket No. 17 at 2.  Wardcraft asserts that "it is entitled to summary judgment in its favor as to Defendants' [sic] duty to defend" and seeks an order in Wardcraft's favor "as to the breach of Defendant's duty to defend Plaintiff in the underlying lawsuit."  *Id.* at 3,

---

[4]Although the settlement agreement states that the parties agree to "keep the terms of this Agreement . . . completely confidential," Wardcraft attached a copy of the settlement agreement to its response to EMC's motion for summary judgment, which was not filed under restriction.  *See* Docket No. 32.

16.  Although Wardcraft does not clearly indicate on which claims it seeks summary judgment, the Court construes Wardcraft's motion as seeking summary judgment only as to EMC's duty to defend the Stuhr suit.  On January 15, 2014, EMC filed its motion for summary judgment, arguing that Wardcraft's breach of contract and declaratory judgment claims fail because EMC had no duty to defend or indemnify Wardcraft and arguing that Wardcraft's bad faith and statutory claims are barred by the statute of limitations.  Docket No. 24 at 19.

## II.  STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56 when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248-50 (1986).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & Cnty. of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

The nonmoving party may not rest solely on the allegations in the pleadings, but instead must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e).  "To avoid summary judgment, the

nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Bausman v. Interstate Brands Corp.,* 252 F.3d 1111, 1115 (10th Cir. 2001) (citing *Hulsey v. Kmart, Inc.,* 43 F.3d 555, 557 (10th Cir.1994)). "In applying this standard, we view all facts and any reasonable inferences that might be drawn from them in the light most favorable to the nonmoving party." *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).

## III.  ANALYSIS

### A.  Duty to Defend

Wardcraft argues that a duty to defend the Stuhr suit arose because the Stuhr Complaint contained claims falling within the policy's property damage coverage and advertising injury coverage.  Docket No. 17 at 5-6.  EMC claims that the Stuhr Complaint did not allege any claims potentially covered under the policy.  Docket No. 24 at 2.  Under Colorado law,[5] the duty to defend is separate and distinct from an insurer's obligation to indemnify its insured.  *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1086 n.5 (Colo. 1991).  While "[t]he duty to indemnify relates to the insurer's duty to satisfy a judgment entered against the insured, . . . [t]he duty to defend concerns an insurance company's duty to affirmatively defend its insured against pending claims." *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 299 (Colo. 2003) (internal quotations and citations omitted).

> [T]he duty to defend arises where the alleged facts even *potentially* fall within the scope of coverage, but the duty to indemnify does not arise unless the policy *actually* covers the alleged harm.  Where there is no duty to defend,

---

[5]The parties appear to assume that Colorado law applies.  Finding no reason to apply the law of a different jurisdiction, the Court concurs and will apply Colorado law.

it follows that there can be no duty to indemnify.  However, where there is a
duty to defend, there is not necessarily a duty to indemnify.

*Constitution Assocs. v. N.H. Ins. Co.*, 930 P.2d 556, 563 (Colo. 1996) (emphasis in

original, citation omitted).

"As a general rule under Colorado law, an insurer's duty to defend an insured is

triggered solely on the basis of the allegations made within the four corners of the

complaint, read against the insurance policy." *United Fire & Cas. Co. v. Boulder Plaza*

*Residential, LLC*, 633 F.3d 951, 960 (10th Cir. 2011); *see also Cotter Corp. v. Am.*

*Empire Surplus Lines Ins. Co.*, 90 P.3d 814, 829 (Colo. 2004).  To show that the insurer

had a duty to defend, "the insured need only show that the underlying claim may fall

within policy coverage." *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 614 (Colo.

1999) (internal citations and quotations omitted).  To defeat a duty to defend, an insurer

bears a "heavy burden." *Hecla Mining*, 811 P.2d 1089.  The insurer must establish that

"there is no factual or legal basis on which the insurer might eventually be held liable to

indemnify the insured." *Id.* at 1090.  Where policy exclusions are implicated, "the

insurer bears the burden of establishing that 'the allegations in the complaint are solely

and entirely within the exclusions in the insurance policy.'" *Cotter Corp.*, 90 P.3d at 829

(citation omitted).  Accordingly, where "there is some doubt as to whether a theory of

recovery within the policy coverage has been pleaded, the insurer must accept the

defense of the claim." *City of Littleton*, 984 P.2d at 613-14 (Colo. 1999).  If the

underlying complaint includes more than one claim, a duty to defend against all claims

asserted arises if any one of the claims arguably is a risk covered by the relevant

insurance policy. *Horace Mann Insurance Co. v. Peters*, 948 P.2d 80, 85 (Colo. App.

7

1998) (citation omitted).  The existence of a duty to defend against a particular claim is a question of law.  *See Bumpers v. Guar. Trust Life Ins. Co.*, 826 P.2d 358, 360 (Colo. App. 1991); *see also Carl's Italian Rest. v. Truck Ins. Exch.*, 183 P.3d 636, 639 (Colo. App. 2007).

The interpretation of an insurance policy is a legal question.  *Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002).  An insurance policy is a contract, which should be interpreted consistently with the well-settled principles of contractual interpretation. *Chacon v. Am. Family Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided.  *Allstate Ins. Co. v. Starke*, 797 P.2d 14, 18 (Colo. 1990).  Clauses or phrases should not be viewed in isolation; rather, a policy's meaning must be determined by examining the entire instrument.  *Huizar*, 52 P.3d at 819.  Policy provisions that are clear and unambiguous should be enforced as written.  *Chacon*, 788 P.2d at 750.  Where a term in an insurance policy is ambiguous, meaning it is susceptible to more than one reasonable interpretation, the Court will construe the term against the drafter and in favor of providing coverage to the insured.  *Sachs v. Am. Family Mut. Ins. Co.*, 251 P.3d 543, 546 (Colo. App. 2010).

The parties initially disagreed as to which underlying complaint should be considered in determining EMC's duty to defend.  In its summary judgment motion, Wardcraft claimed that the duty to defend arose from the allegations in the Second Amended Complaint.  *See, e.g.*, Docket No. 17 at 3, ¶¶ 4, 5 (citing Docket No. 17-2). However, Wardcraft failed to provide any evidence disputing EMC's claim that

Wardcraft did not tender to EMC the Second Amended Complaint. Docket No. 32 at 1, ¶ 4. In its reply brief, Wardcraft appears to have abandoned its earlier position and now argues that "[a]ll of the information necessary to establish the duty to defend is contained in the four corners of the original complaint." Docket No. 29 at 8.[6] As such, the Court will initially determine whether the duty to defend arose based upon the allegations contained in the Stuhr Complaint.

### 1. Property Damage

### a. Occurrence

The Court first considers the parties' arguments concerning property damage coverage under the policy. The policy covers "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage.'" Docket No. 17-3 at 12, ¶ 1.a. Property damage can be either "a. Physical injury to tangible property, including all resulting loss of use of that property . . . ; or b. Loss of use of tangible property that is not physically injured . . . ." Docket No. 17-4 at 6-7, ¶ 17. The policy applies to, as relevant here, property damage "only if . . . [t]the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.'" Docket No. 17-3 at 12, ¶ 1.b.(1). "Occurrence" is defined under the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Docket No. 17-4 at 6, ¶ 13. The parties dispute whether the Stuhr Complaint alleges an "occurrence."

In Colorado, CGL policies protect the insured from claims for "personal injury or

---

[6]To the extent the Second Amended Complaint may be relevant to the duty to indemnify, the Second Amended Complaint is discussed below.

property damage resulting from accidents." *Boulder Plaza*, 633 F.3d at 959.  On the other hand, CGL policies do not protect the insured from unsatisfactory performance of a contract.  *Id.* ("[t]he risk that an owner might reject performance as inadequate is a 'business risk' allocated by parties in contract, and is . . . not [covered by] general liability insurance intended to provide coverage for injuries or damage resulting from 'accidents'" (quoting *DCB Constr. Co. v. Travelers Indem. Co. of Ill.*, 225 F. Supp. 2d 1230, 1231 (D. Colo. 2002)).  In *Greystone*, the Tenth Circuit considered the meaning of "occurrence" in the context of the duty to defend.  661 F.3d at 1276.  Greystone was a home builder and general contractor who employed subcontractors to perform all of the work on the home that was the subject of the underlying suit.  *Id.*  The home buyers filed suit against Greystone, claiming that the house was damaged due to a subcontractor's negligent design and construction of the soil drainage and structural aspects of the home.  *Id.*  One of Greystone's CGL insurers refused to defend the underlying suit.  *Id.*  The Tenth Circuit considered whether property damage arising from poor workmanship constitutes an "occurrence" under the CGL definition of the term.  *Id.* at 1281.  The court determined that an occurrence under a CGL policy can encompass "unforeseeable damage to nondefective property arising from faulty workmanship."  *Id.* at 1282.[7]  With respect to foreseeability, the question is "whether damages would have been foreseeable if the builder and his subcontractors had completed the work properly."  *Id.* at 1285.  With respect to defective property, the

---

[7]In other words, "injuries flowing from improper or faulty workmanship constitute an occurrence so long as the resulting damage is to nondefective property, and is caused without expectation or foresight."  *Id.* at 1284.

Tenth Circuit noted that the "obligation to repair defective work is neither unexpected nor unforeseen under the terms of the construction contract or the CGL policies [and t]herefore . . . represents an economic loss that does not trigger a duty to defend under the CGL policies." *Id.* at 1286.  However, if defective work causes damage to a nondefective aspect of the property, CGL coverage is implicated.  *Id.*  In the case of the claims against Greystone, damage to the defective soil-drainage and structural elements themselves was not covered, but damage suffered by nondefective elements of the home that may have been caused by those defective elements was covered under the CGL policy.  *Id.*

Applying *Greystone*,[8] the Court reviews the Stuhr Complaint to determine whether it contains a factual or legal basis to conclude that the claimed damages resulted from an occurrence.  The Court first considers allegations that may be related to physical injury  to the property at issue.  The Stuhr Complaint alleges that Wardcraft negligently constructed the Stuhrs' home and specifically claims that Wardcraft improperly installed the floor heating system and provided cabinets and vanities that did not comply with the purchase agreement.  Docket No. 20-1 at 3, ¶ 17, at 5, ¶ 44.  The

---

[8]The Court notes that the Colorado Supreme Court has granted a petition for certiorari in *Colorado Pool Systems Inc. v. Scottsdale Insurance Co.*, 2013 WL 4714283 (Colo. Sep. 3, 2013), a case where the Colorado Court of Appeals applied *Greystone* in concluding that the plaintiff's CGL policy covered damage to "nondefective third-party work."  *Colo. Pool Sys. Inc. v. Scottsdale Ins. Co.*, 317 P.3d 1262, 1271 (Colo. App. 2012).  The Court also notes that, for purposes of Colorado insurance law, the term "accident" is now defined by Colo. Rev. Stat. § 13-20-808.  However, the parties do not claim that § 13-20-808 applies and, because the statute was enacted in 2010 and has been found not to apply retroactively to policies "for which the policy period had not yet expired on May 21, 2010," the Court will not apply it in this case.  *TCD, Inc. v. Am. Family Mut. Ins. Co.*, 296 P.3d 255, 260 (Colo. App. 2012).

Stuhr Complaint alleges that the cost to complete the home exceeded that which was contemplated by the purchase agreement, causing the Stuhrs to use "funds from their retirement account to pay the extra charges and fees.  As a result, Plaintiffs will be required to pay tax penalties and fees . . . ."  *Id.* at 3, ¶ 16.  Neither party specifically addresses this allegation.  In the absence of any argument or allegations to the contrary, the Court finds no indication that any portion of such actual and consequential damages flowed from a nondefective aspect of the Stuhrs' home.  *See United Fire*, 633 F.3d at 959.

The Court next turns to the question of whether the Stuhr Complaint alleged the property damage to nondefective property in the form of loss of use of property "that is not physically injured."  Docket No. 17-4 at 7, ¶ 17.  DBI allegedly promised that the Stuhrs' home would be completed by Christmas 2007, but delivery of the modules was delayed, the issuance of a certificate of occupancy was delayed, and the Stuhrs were unable to move into the home until December 22, 2008.  Docket No. 20-1 at 3, ¶ 18.  Due to such delays, the Stuhrs alleged that they:

> [P]a[id] additional monies to extend their construction loan to keep their permanent financing available.
>
> [R]esided in a condominium they owned until the home was ready for occupation . . . and were unable to rent the condominium for income purposes.
>
> [H]ad to rent storage units for an additional period of time to store household belongings and appliances for the home.

*Id.* at 3-4, ¶ 19, 24.  EMC argues that the Stuhr Complaint fails to allege "non-defective portions," such that the only damage claimed is to defective portions of the home.  Docket No. 24 at 10.  However, the Stuhr Complaint need only contain sufficient facts

to make it possible that the loss of use due to nondefective elements may have been caused by defective elements.  It is possible that Wardcraft's poor workmanship with respect to the floor heating system and failure to install correct cabinets and vanities caused a delay resulting in loss of use to other, nondefective aspects of the home.

EMC also argues that the Stuhr Complaint does not state what property was damaged and, as such, fails to allege that any property damage occurred.  Docket No. 33 at 5-6.  However, this argument fails to account for the fact that loss of use to property that has not been physically injured is considered property damage under the policy.  Docket No. 17-4 at 6-7, ¶ 17.  Moreover, the Stuhr Complaint's specific allegations concerning loss of use damages, *see, e.g.*, Docket No. 20-1 at 4, ¶ 24, sufficiently allege "additional consequential property damages have been inflicted upon a third party as a result of the insured's activity."  *See General Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 535 (Colo. App. 2009), *superseded by statute as stated in TCD, Inc. v. Am. Family Mut. Ins. Co.*, 296 P.3d 255 (Colo. App. 2012).  Thus, this is not a case, as EMC suggests, of conclusory allegations of consequential damages.  *Cf. TCD, Inc.*, 296 P.3d at 259 ("Notably absent from Gateway's counterclaims is any specific allegation that Petra caused damage beyond its own work product.").  The alleged damages also meet the threshold for unforeseeability established in *Greystone*.  The Stuhr Complaint contains no suggestion that Wardcraft's or DBI's workmanship was intentionally poor or that they intended for their defective work to cause a loss of use to other nondefective aspects of the Stuhrs' home.  *See Greystone*, 661 F.3d at 1285 ("'occurrence' excludes from coverage only

13

'those damages that the insured *knew would flow directly and immediately from its intentional act*'" (quoting *Hecla Mining*, 811 P.2d at 1088) (emphasis in original)).  The Court finds that the Stuhr Complaint contains sufficient allegations that make it possible that poor workmanship to defective aspects of the Stuhrs' home caused unforeseeable property damage in the form of loss of use to nondefective aspects of the Stuhrs' home and, as a result, finds that the Stuhr Complaint alleged an occurrence with respect to property damage in the form of loss of use of property that was not physically injured.

### b.  Impaired Property Exclusion

The Court turns to EMC's argument that coverage is barred by the impaired property exclusion.  Docket No. 24 at 15.  The impaired property exclusion states:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

Docket No. 17-3 at 16, ¶ m.  "Your product" is defined under the policy as "goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by" the insured or others trading under the insured's name.  Docket No. 17-4 at 7, ¶ 21.  "Your work" means "(1) Work or operations performed by you or on your behalf; and (2) Materials, parts or equipment furnished in connection with such work or operations."  *Id.* at 7, ¶ 22.  Because the Stuhr Complaint sufficiently alleged an occurrence with respect to loss of use of property that was not physically injured, in order to defeat the duty to defend, EMC must show that this occurrence falls "solely and

14

entirely within the exclusions in the insurance policy.'" *Cotter Corp.*, 90 P.3d at 829

(citation omitted); *see also DCB Constr.*, 225 F. Supp. 2d at 1232-33 (determining

whether alleged occurrence was subject to policy exclusions).

EMC argues that this exclusion bars coverage for the loss of use of nondefective

property under paragraph (1) and for all claims for delay damages for failure to deliver

the home on time under paragraph (2).  Docket No. 24 at 15.  Wardcraft does not

respond to EMC's argument that the impaired property exclusion applies.  Thus, the

Court finds that Wardcraft has conceded EMC's argument on this issue.  Moreover, the

Court is otherwise satisfied that the exclusion applies to the alleged occurrence

identified above.  The defects alleged in the Stuhr Complaint occurred while the Stuhrs'

home was being manufactured and before the home became real property.  As such,

the manufactured home falls within the definition of "Your product."  To the extent the

Stuhr Complaint alleges that the home's defects resulted in loss of use damages, such

damages arise out of a defect and are excluded under m.(1).  To the extent such loss

of use damages arose out of a delay or failure by Wardcraft or DBI to perform under the

purchase agreement, such damages are excluded under m.(2).  To the extent that any

delay in delivery of the modules is attributed to Wardcraft, it falls within the definition of

"Your work" and is excluded for the same reasons.  *See DCB Constr. Co., Inc. v.*

*Travelers Indem. Co. of Ill.*, 225 F. Supp. 2d 1230, 1233 (D. Colo. 2002) (underlying

claim that constructed walls were not designed according to contractual specifications

fell within impaired property exclusion because claim did not indicate that walls were in

fact physically damaged).

Even if the Stuhr Complaint contains allegations that damages were caused by

delay after the home was considered real property, the Stuhrs' home would be considered impaired property, which is defined as

> tangible property, other than 'your product' or 'your work', that cannot be used or is less useful because:
>
> a. It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> b. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> a. The repair, replacement, adjustment, or removal of 'your product' or 'your work'; or
>
> b. Your fulfilling the terms of the contract or agreement.

Docket No. 17-4 at 4-5, ¶ 8.  The Stuhrs' home, even after it became real property, incorporated Wardcraft's product that was known to be defective (or violated the terms of the purchase agreement) and could have been restored in either manner set forth in the policy.  Thus, if the Stuhrs' home was impaired property, for the above stated reasons, it falls under the impaired property exclusion.  The Court concludes that EMC has satisfied its burden of showing that the impaired property exclusion applies to the alleged occurrence.[9]  *See Am. Mfrs. Mut. Ins. Co. v. Seco/Warwick Corp.*, 266 F. Supp. 2d 1259, 1268 (D. Colo. 2003) ("Indeed, Goodrich has claimed no tangible 'property damage' apart from . . . excluded [physical] damage to Seco's furnaces.  Goodrich argues that such property damage exists in the loss of use of furnace capacity . . . , [but] even if such damage could be considered property damage, rather than purely economic loss, it falls under [impaired property] exclusion.").  The Court finds that the

---

[9]The Court need not consider whether any other identified exclusions apply.

16

Stuhr Complaint contains no factual or legal basis facts upon which to conclude that EMC would be liable for property damage as defined by the policy.

### 2. *Advertising Injury*

The parties dispute whether the Stuhr Complaint contains sufficient allegations to trigger a duty to defend under the policy's personal and advertising injury coverage. Docket No. 17 at 11; Docket No. 24 at 16.  The policy provides coverage for damages the insured is legally obligated to pay because of "personal and advertising injury," which is an injury

arising out of one or more of the following offenses:

a.  False arrest, detention or imprisonment;

b.  Malicious prosecution;

c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy . . . ;

d. Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's good, products or services;

e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

f.  The use of another's advertising idea in your "advertisement"; or

g. Infringing upon another's copyright, trade dress or slogan in your "advertisement."

Docket No. 17-4 at 6, ¶ 14.[10]   Wardcraft vaguely suggests that its potential liability for

---

[10]The term "advertisement" in the policy is defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters."  *Id.* at 4, ¶ 1.  EMC does not appear to dispute the Stuhr Complaint implicates the use of the Energy Star moniker in advertising.

such damages arose out of its "use of another's advertising idea."  Docket No. 17 at 11.

Wardcraft must therefore demonstrate that (1) the underlying complaint can be read to

allege the use of another's advertising idea in its advertisement, and (2) Wardcraft's

advertising activities caused the injury which formed the basis for the Stuhrs' damages.

*DISH Network Corp. v. Arch Specialty Ins. Co.*, 659 F.3d 1010, 1015 (10th Cir. 2011);

*see also Novell, Inc. v. Fed. Ins. Co.*, 141 F.3d 983, 985-86 (10th Cir. 1998).

Colorado courts provide little guidance as to the proper interpretation of "the use

of another's advertising idea."  *DISH*, 659 F.3d at 1021.  The Court therefore will look to

the definition provided by other jurisdictions.  Most courts presented with this issue have

held that the "use of another's idea" means the "wrongful taking of the manner by which

another advertises its goods or services" or the "wrongful taking of an idea about the

solicitation of business."  *Discover Fin. Servs., LLC v. Nat'l Union Fire Ins. Co.*, 527 F.

Supp. 2d 806, 824 (N.D. Ill. 2007) (quoting *Amazon.com Int'l, Inc. v. Am. Dynasty

Surplus Lines Ins. Co.*, 85 P.3d 974, 976 (Wash. App. 2004)).  Wardcraft makes no

meaningful attempt to suggest that the Stuhr Complaint alleges that Wardcraft

wrongfully took another's advertising idea and the Stuhr Complaint contains no such

suggestion.  The Stuhr Complaint contains no allegations that raise the possibility that

Wardcraft wrongfully used the Energy Star moniker without permission or otherwise

misappropriated the Energy Star moniker from its source.  *Cf. DISH*, 659 F.3d at 1022

(finding that duty to defend arose where complaint alleged that insured misappropriated

a product designed for advertising purposes).[11]  Rather, Wardcraft cites *Flodine v. State*

---

[11]To the extent Wardcraft makes factual assertions concerning how a business
acquires the right to use the Energy Star moniker, such facts are outside the four

*Farm Ins. Co.*, 2001 WL 204786, at *2 (N.D. Ill. March 1, 2001),[12] in support of its argument that the advertising use of a descriptive term that does not apply to the product constitutes the "use of another's idea."  In *Flodine*, Native American Arts, an Indian arts and crafts organization, and the Ho-Chunk Nation, an Indian tribe, brought suit against a craft distributor for falsely advertising that its products were made by Native Americans, claiming consumer confusion and loss of sales.  *Id.* at *2.  The craft distributor then brought claims against the craft maker, claiming that the craft maker misrepresented the nature of the goods.  *Id.*  The craft maker tendered the complaint to her CGL insurer.  *Id.* at *4.  The court found that the false "marketing and promotion of products as 'authentic Indianmade' reasonably [fell] within the common meaning of 'style of doing business' or 'advertising idea,'" but also noted that the underlying claims were "analogous to the kind of claims for trademark or trade dress infringement that fall within the definition of 'advertising injury.'"  *Id.* at *11.  Here, however, the Stuhrs' claims are not analogous to any of the other enumerated advertising injuries because, as noted above, the Stuhr Complaint contains no allegation that Wardcraft misappropriated the Energy Star moniker.  Thus, *Flodine* is distinguishable, and the Court declines to adopt Wardcraft's interpretation of the term "use of another's advertising idea."  Moreover, Wardcraft fails to cite any cases where a claim for false

---

corners of the Stuhr Complaint and therefore cannot be appropriately considered in determining EMC's duty to defend.  *See United Fire*, 633 F.3d at 960.

[12]The other cases Wardcraft cites on the issue of advertising injury found that the term "use of another's advertising idea" was ambiguous.  *See, e.g.*, *Am. Simmental Assoc. v. Coregis Ins. Co.*, 282 F.3d 582, 587 (8th Cir. 2002).  Such cases are, however, unpersuasive because Wardcraft does not argue that the policy is ambiguous and the Court finds no basis for so concluding.

advertising brought by the consumer was found to be within the scope of advertising injury.  The Court finds that the Stuhr Complaint does not allege advertising injury as defined in the policy.

Even if the Stuhr Complaint alleged the existence of an advertising injury, Wardcraft must show that the complained of injury arose in the course of advertising. *DISH*, 659 F.3d at 1015.  As the Tenth Circuit stated in *Novell*, for an advertising injury to trigger a duty to defend, the "*advertising activities* must *cause* the injury-not merely expose it."  141 F.3d at 989 (emphasis in original; citation omitted).  EMC relies on *Basic Research, LLC v. Admiral Ins. Co.*, 297 P.3d 578 (Utah 2013), in support of its argument that the Stuhrs' damages did not arise out of an advertising injury.  Docket No. 24 at 16.  In *Basic Research*, purchasers of a weight loss product brought suits against the product's manufacturer, claiming false advertising and that the product failed to perform as promised in marketing slogans.  297 P.3d at 579.  The manufacturer tendered the claims to its insurer, who refused to defend the suits.  *Id.* Interpreting a CGL policy, the relevant portions of which appear identical to the policy at issue in the present case, the court found that the underlying claims were not covered because the claims were not dependant on the source of the marketing slogans, but rather on whether the manufacturer "used the slogans to market a defective product." *Id.* at 581.  As such, the court held that allowing the manufacturer to invoke coverage "based on underlying claims of this sort would require indemnification where there is *any* but-for causal link between the 'use of another's advertising idea' and an underlying plaintiff's damages, no matter how legally irrelevant the link."  *Id.* (emphasis in original).

Wardcraft's attempts to distinguish *Basic Research* are unavailing and fail to account for the fact that the Stuhr Complaint does not implicate the source of the Energy Star moniker.  Moreover, the Court finds the reasoning in *Basic Research* persuasive.  The Stuhr Complaint does not suggest that the Stuhrs suffered injury from the mere use of the Energy Star representation.  Rather, the Stuhrs were "actual consumers" of the non-Energy Star compliant Wardcraft home and "sustained damages as a result."  Docket No. 20-1 at 8, ¶ 76.  As such, their injuries arose from Wardcraft's failure to deliver on the promise that the Stuhrs' home would be Energy Star compliant, not Wardcraft's misappropriation of the Energy Star moniker.  In other words, had the Stuhrs instead chosen not to purchase a home, they would have suffered no injury as a result of Wardcraft's use of the Energy Star moniker.  Conversely, if Wardcraft had delivered on its promise, then the Stuhrs would not have suffered the claimed injury.[13] Wardcraft argues that the CCPA allows a consumer to recover if he or she "had been exposed to the defendant's deceptive advertisements and had either made purchases or had undertaken any other activities in reliance on the advertisements."  Docket No. 32 at 6 (quoting *Crowe v. Tull*, 126 P.3d 196, 210 (Colo. 2006)).  The Court rejects Wardcraft's argument.  The Stuhrs' damages were not caused by the mere fact that Wardcraft used the Energy Star moniker, but instead arose from the Stuhrs' status as "actual consumers" of the advertised product.  *See Basic Research*, 297 P.3d at 581-82

---

[13]*Flodine* is also distinguishable on this basis because Native American Arts and the Ho-Chunk Nation claimed a loss of sales because consumers "were persuaded to buy and wished to purchase authentic goods but were tricked into buying the counterfeits," and, unlike the Stuhrs, were not consumers of the wrongfully advertised products.  2001 WL 204786 at *2.

("the underlying claims do not depend on whether Basic Research owned or was otherwise entitled to use the slogans, but on whether the slogans constitute false advertising"). The Court finds that the Stuhr Complaint does not implicate the policy's coverage for advertising injury. The Court will grant EMC's motion for summary judgment on this issue.

## B. Duty to Indemnify

Given that the Court concludes that EMC had no duty to defend the Stuhr suit, the question becomes whether this conclusion forecloses Wardcraft's claim for failure to indemnify. Ordinarily, "once an insurer has prevailed on the duty to defend, the issue of the duty to indemnify is ripe for resolution because "[w]here there is no duty to defend, it follows that there can be no duty to indemnify." *Compass*, 984 P.2d at 621 (quotations omitted); *see also Boulder Plaza*, 633 F.3d at 961. For the foregoing reasons, EMC had no duty to defend the Stuhr suit upon receipt of the Stuhr Complaint and no corresponding duty to indemnify arising from the Stuhr Complaint. However, the Stuhr suit was not entirely adjudicated based upon the Stuhr Complaint, but, after March 9, 2012, was litigated under the Second Amended Complaint until the parties reached a settlement. There is no dispute that Wardcraft did not tender the Second Amended Complaint to EMC as contemplated by the policy's notice provision. *See* Docket No. 17-4 at 2, ¶¶ 2.b(2), 2.c(1) (requiring Wardcraft to notify EMC of any suit "as soon as practicable" and "send [EMC] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit'").[14] Neither party addresses

---

[14]The Court need not reach Wardcraft's argument that, because EMC denied coverage, Wardcraft was no longer under a duty to provide EMC any additional

the effect of the Second Amended Complaint, which EMC did not have notice of until after the commencement of this suit.  Docket No. 24 at 3, ¶ 4.

The Complaint and Second Amended Complaint contain substantially identical factual allegations.  *Compare* Docket No. 20-1 at 2-4, *with* Docket No. 17-2 at 2-5.  The only apparent difference between the two complaints is that the Second Amended Complaint's negligence claim against Wardcraft is additionally asserted against Mr. Pool, Terry's Crane and Rigging, Inc., and Preferred Transportation, Inc. and alleges that all four entities owed a duty of care "in connection with any services they performed related to the construction of Plaintiff's home," that all four entities "negligently performed the services they provided and breached or may have breached their duties of care related to the construction of Plaintiff's home," and that the Stuhrs incurred damages as a result.  Docket No. 17-2 at 6, ¶¶ 48-50.  In responding to EMC's motion for summary judgment, which raises the issue of EMC's duty to indemnify, Wardcraft does not argue that the Second Amended Complaint materially changes the allegations forming the basis of the Stuhr suit and the Court finds no basis for so concluding.[15] Rather, Wardcraft admits that the Second Amended Complaint "only added additional allegations against additional DBI subcontractors, the conduct of whom DBI may or may not have been legally responsible for."  Docket No. 32 at 9.  Because neither party has

---

documents from the Stuhr suit.  Docket No. 29 at 8; *see also* Docket No. 17-4 at 2. Even if EMC were imputed with knowledge of the Second Amended Complaint, Wardcraft, as discussed below, fails to provide any evidence or argument suggesting that the outcome would be different.

[15]To the contrary, in its reply brief Wardcraft states "[a]ll of the information necessary to establish the duty to defend is contained in the four corners of the original complaint."  Docket No. 29 at 8.

identified a basis upon which to conclude the application of the impaired property exclusion would differ under the Second Amended Complaint, the Court concludes that no duty to indemnify arose from the Second Amended Complaint.[16]  Moreover, Wardcraft identifies no evidence that would raise a genuine dispute of material fact that the claims covered by the settlement agreement differ in any material respect from the pleadings in the Stuhr suit.  *See Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 301 (Colo. 2003) (noting that a trial court can review matters outside the complaint "as to whether some portion or all of the settlement would be properly subject to indemnification").  As such, the Court finds that EMC is entitled to summary judgment on Wardcraft's claim that EMC breached the insurance contract by refusing to indemnify Wardcraft for payment made under the settlement agreement.

### C.  Claims for Bad Faith Breach of Insurance Contract and Violation of Colo. Rev. Stat. § 10-3-1115 and § 10-3-1116

EMC moves for summary judgment on Wardcraft's claim for bad faith breach of insurance contract and claim for violation of Colo. Rev. Stat. §§ 10-3-1115 and 10-3-1116, arguing that both claims are barred by the statute of limitations.  Docket No. 24 at 7.  Bad faith actions must be "commenced within two years after the cause of action accrues."  Colo. Rev. Stat. § 13-80-102(1)(a).  A bad faith cause of action accrues "on the date both the injury and its cause are known or should have been known by the exercise of reasonable diligence."  Colo. Rev. Stat. § 13-80-108(1); *accord Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 147 (Colo. 2007) (applying § 13-80-108 to

---

[16]Although Wardcraft argues that the Second Amended Complaint's addition of parties is relevant to the application of the "Your work" exclusion, as noted above, the Court need not decide whether that exclusion applies.

bad faith tort claim).  "Each bad faith act constitutes a separate and distinct tortious act, on which the statute of limitation begins to run anew when plaintiff becomes aware of the injury and its cause."  *Cork v. Sentry Ins.*, 194 P.3d 422, 427 (Colo. App. 2008).

Wardcraft's complaint, filed on February 4, 2013, identifies a single act of bad faith: the February 5, 2010 letter from EMC denying coverage, indicating that it would not indemnify Wardcraft, and declining to provide a defense.  Docket No. 3 at 3, ¶ 21; Docket No 17-7 at 5 ("Because there is no duty to indemnify, a defense will not be provided.").  Wardcraft does not dispute that, as of February 5, 2010, it was aware of an injury and cause as related to EMC's refusal to defend the Stuhr suit.  *See* Docket No. 32 at 3.  As such, that portion of Wardcraft's claim is barred by the statute of limitations.

Wardcraft argues that it has also alleged that EMC acted in bad faith by unreasonably refusing to indemnify.  *Id.*  Wardcraft argues that, because the contractual duty to indemnify did not arise until it settled the Stuhr suit on January 31, 2013, Wardcraft had no injury until it became responsible for paying the Stuhrs under the settlement.  *Id.*  However, Wardcraft does not appear to allege that EMC's actions with respect to the duty to indemnify were unreasonable.  Although the general factual allegations in Wardcraft's complaint allege that it was entitled to defense *and* indemnity, Wardcraft's bad faith claim alleges only that EMC unreasonably refused to "provide a defense" and makes no suggestion that EMC engaged in bad faith for failure to indemnify.  *See* Docket No. 3 at 4, ¶¶ 31-35.  As such, Wardcraft does not allege that EMC "knowingly or recklessly disregarded the validity" of Wardcraft's claim for indemnity.  *See Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 415 (Colo.

2004).  Because Wardcraft fails to plead a claim for bad faith related to EMC's refusal

to indemnify, Wardcraft fails to show that any aspect of its bad faith claim survives.

The Court turns to Wardcraft's claims for violation of § 10-3-1115 and § 10-3-

1116, which accrue in the same manner as bad faith claims.  *See Gargano v. Owners*

*Ins. Co.*, No. 12-cv-01109-CMA-BNB, 2014 WL 1032303, at *3 (D. Colo. March 18,

2014) (applying § 13-80-108 to § 10-3-1115 and § 10-3-1116 claims); *Duvall v. Cit Grp.*,

No. 13-cv-02634-MSK-MJW, 2014 WL 537445, at *6 (D. Colo. Feb 11, 2014) (same).

The parties do not appear to dispute that a two year statute of limitations applies to

Wardcraft's statutory claims.  Docket No. 24 at 6; Docket No. 32 at 2-3; *see also*

*Gargano*, 2014 WL 1032303, at *3 (applying § 13-80-102 to § 10-3-1115 and § 10-3-

1116 claims); *Alarcon v. Am. Fam. Ins. Grp.*, No. 08-cv-01171-MSK-MJW, 2010 WL

2541131, at *1 n.5 (D. Colo. June 18, 2010) (noting that both common law bad faith

and §§ 10-3-1115 and 10-3-1116 are tort claims and are therefore "governed by the

same statute of limitation").  As above, Wardcraft does not dispute that its claim for

violation of § 10-3-1115 and § 10-3-1116 is based upon EMC's "failure to provide a

defense" and is therefore time barred.  As such, that portion of Wardcraft's claim is

dismissed.  Although Wardcraft again claims to bring a statutory claim based upon

EMC's refusal to indemnify, Wardcraft's complaint does not contain factual allegations

that give rise to a claim that EMC unreasonably denied or delayed payment of a claim

for indemnity.  Docket No. 3 at 4, ¶¶ 36-40; *see also* § 10-3-1115(1)(a) (stating that

insurer "shall not unreasonably delay or deny payment of a claim for benefits").  Thus,

Wardcraft fails to show that any portion of its statutory claim accrued within the statute

of limitations.[17]  The Court finds that EMC is therefore entitled to summary judgment on Wardcraft's claim for violation of § 10-3-1115 and § 10-3-1116.

## IV.  CONCLUSION

For the foregoing reasons, it is

**ORDERED** that plaintiff's Motion for Partial Summary Judgment [Docket No. 17] is **DENIED**.  It is further

**ORDERED** that defendant's Motion for Summary Judgment [Docket No. 24] is **GRANTED**.  It is further

**ORDERED** that, within 14 days of the entry of judgment, defendant may have its costs by filing a bill of costs with the Clerk of the Court.  It is further

**ORDERED** that this case is dismissed in its entirety.


DATED September 29, 2014.

BY THE COURT:


 s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

---

[17]Because Wardcraft's claims are untimely under a two year statute of limitations, the Court need not decide whether a shorter limitations period applies.